IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | CRIMINAL NO. 17-129 |
| **MARK NEISSER** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The defendant represented an engineering firm and conspired in a pay-to-play scheme with the mayor of Reading, Pennsylvania, paying bribes in the form of campaign contributions in exchange for the offer of lucrative municipal engineering contracts. The government asks the Court to consider all of the factors set forth below, and impose a non-custodial sentence consisting of 5 years' probation with the first 12 months on house arrest, and a substantial fine.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

>(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
>(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
>(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006); *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006)). See also *United States v. Smalley*, 2008 WL 540253, *2 (3d Cir. Feb. 29, 2008) (stating that the *Gunter* directive is consistent with later Supreme Court decisions). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc). The failure to properly calculate the advisory guideline range will rarely be harmless error. *United States v. Langford*, 2008 WL 466158, *8-11 (3d Cir. Feb. 22, 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *Cooper*, 437 F.3d at 329. See also *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Schweitzer*, 454 F.3d 197, 205-06 (3d Cir. 2006).

The government explains its view below that the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors should result in a non-custodial

2

sentence of 5 years' probation with the first 12 months on house arrest, and a substantial fine. The government submits that such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

## I.     BACKGROUND

Between January 2012 and July 2015, then-Mayor of Reading Vaughn Spencer solicited multiple bribes in the form of contributions to his re-election campaign from the engineering firm T&M Associates (T&M) in exchange for his agreement to engage in official acts, including the awarding of the 6th & Canal Long Term Improvements contract, and the 19th Ward Pump Station contract. These explicit *quid pro quo* agreements were established through the testimony of trial witnesses, including the defendant, who handled business development for T&M and engaged in *quid pro quo* conversations with Mayor Spencer; Sam Ruchlewicz, who worked on the mayor's campaign, solicited contributions from the defendant for the mayor, and recorded conversations with both the defendant and the mayor; Ralph Johnson, the Director of Public Works; and various contract evaluation committee members, who were involved in the contract awarding process.

Exhibits admitted at trial, including numerous checks, recorded conversations, evaluation committee score sheets, and contract recommendation memoranda, established the following overt acts. On January 5, 2012, T&M contributed $1,500 to defendant's inauguration and transition fund. Presentence Report ("PSR") ¶ 16. In March 2012, Mayor Spencer directed that T&M be awarded the Secondary Digester engineering contract in Reading despite T&M not being the preferred bidder selected by the evaluation committee. *Id.* The approximate value of this contract was $205,000. *Id.* On July 23, 2013, defendant Neisser caused T&M to give a $1,000

3

campaign contribution to defendant. *Id.* ¶ 17. On April 23, 2014, Mayor Spencer directed that T&M be awarded the 6th & Canal Short Term Improvements engineering contract in Reading, despite T&M not being the preferred bidder selected by the evaluation committee. *Id.* The approximate value of this contract was $190,000. *Id.* According to the committee members who testified at trial, the mayor clearly inserted himself into the process and overruled the decision of the committee in regard to both of these contracts so that T&M would be awarded the contracts. This conduct set the stage between the parties for the ensuing *quid pro quo* arrangement.

On April 25, 2014, two days after he awarded the 6th & Canal Short Term Improvements contract to T&M, Mayor Spencer stated to Ruchlewicz, "I cleared [the contract] for [T&M]. So we need to get something from them," referring to a campaign contribution. *Id.* ¶ 18. Echoing that same sentiment, on October 24, 2014, the mayor stated to Ruchlewicz regarding his expectation of a $1,500 campaign contribution from T&M, "I went out of my way for [T&M] . . . [T]hat project, they weren't even, they were, they were already ruled out. . . . And I got them back in there and got them approved." *Id.* On October 30, 2014, at the direction of Spencer, Ruchlewicz contacted defendant Neisser by telephone and stated that the mayor was expecting a $1,500 campaign contribution. *Id.* The next day, on October 31, 2014, the defendant asked Ruchlewicz where to send money "to make sure that we don't . . . have a direct effect on the Reading pay to play" law, was told to send the money to a specific political action committee, and was assured that it would benefit defendant. *Id.* In this same conversation, the defendant acknowledged that Mayor Spencer "went out of his way" for T&M by awarding it two prior municipal engineering contracts. *Id.*

On November 24, 2014, the defendant met Mayor Spencer for lunch at a restaurant. *Id.* ¶

4

19. At that meeting, the defendant confirmed that T&M would be giving defendant a $1,500 campaign contribution. *Id.* The mayor stated that he "had to assert [him]self into" the prior contract bidding process on behalf of T&M, and the defendant responded, "I remember," and, "We appreciate your help, Mayor.  We really do." *Id.* The mayor then stated that he would "look into" the 6th & Canal Long Term Improvements contract for which T&M was bidding.  *Id.*  The defendant also offered Spencer four tickets and a parking pass to a Philadelphia Phillies game. *Id.* Spencer then reiterated to the defendant that he would use his elected office to help T&M receive the 6th & Canal Long Term Improvements contract, valued at approximately $227,000. *Id.*  The same day, the defendant caused a $1,500 contribution to be made by T&M to Spencer's re-election campaign. *Id.* Soon thereafter, on January 2, 2015, T&M bid on the 6th & Canal Long Term Improvements contract in Reading. *Id.* However, their bid was approximately three times higher than the other bidders, so Mayor Spencer could not give them the contract without raising suspicion, which he acknowledged in several recorded conversations. *Id.*  On May 20, 2015, the defendant advised Ruchlewicz that he was sending a check for $500 and discussed the potential for T&M to receive the 19th Ward Pump Station contract in Reading, valued in excess of $472,000.

Although he did not testify in the 2018 trial against Allentown Mayor Edwin Pawlowski, the defendant's guilty plea also accounted for his conduct in Allentown. Specifically, T&M made campaign contributions to Mayor Pawlowski in the hopes of obtaining favorable treatment in the awarding of municipal engineering contracts, and the defendant arranged a meeting for Pawlowski with a politically influential businessman. PSR at ¶¶ 20-22.

## II. SENTENCING CALCULATION

### A. Statutory Maximum and Minimum Sentence.

Count One carries a maximum of 5 years' incarceration, a period of supervised release of 3 years, a $250,000 fine, and a $100 special assessment.

### B. Sentencing Guidelines Calculation.

The U.S. Probation Office calculated the Sentencing Guidelines as follows:

| | |
|---|---:|
| Base offense level, 2C1.1(a)(2) | 12 |
| More than one bribe, 2C1.1(b)(1) | +2 |
| Loss of more than $250,000 but less than $550,000, 2B1.1(b)(1)(G) | +12 |
| Offense involved a public official, 2C1.1(b)(3) | +4 |
| Acceptance of responsibility, 3E1.1 | -3 |
| **Adjusted offense level** | **27** |

In light of a Criminal History Category of I, this results in a Guidelines range of 70 to 87 months' incarceration. However, because the statutory maximum for the offense is 60 months' incarceration, that becomes the Guidelines range.

The Probation Office included the enhancement for 12 levels based on an aggregate contract value of $395,000, *see* PSR at ¶ 29, by apparently combining the gross value of the Secondary Digester contract ($205,000) and the 6th & Canal Short Term Improvements contract ($190,000), *see* PSR at ¶¶ 16-17. However, the government did not allege that either of those contracts were part of an explicit *quid pro quo* agreement. Rather, those contracts and the payments in relation thereto were overt acts in furtherance of the conspiracy, setting the stage for the later payment of bribes in exchange for favorable treatment on contract bids. Thus, they do

not form a proper foundation for the value of the benefit received from the actual crime. The object of the actual crime were the 6th & Canal Long Term Improvements and 19th Ward Pump Station contracts.

Section 2C1.1(b)(2) indicates that the table in 2B1.1 should be applied according to "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest." Application Note 3 clarifies that the value of "the benefit received or to be received" means the net value of such benefit (*i.e.*, contract amount minus costs). Put simply, the Guidelines point to the net value of contracts, not the gross value of contracts. In this case, T&M paid bribes in the hopes of receiving the 6th & Canal Long Term Improvements contract and the 19th Ward Pump Station contract, but was awarded neither; hence, it is difficult to assess what the net value (gross minus costs) of the contracts would have been.

The government submits that the dollar value should be based on the total amount in bribe payments actually charged in the indictment of Spencer and connected with an explicit *quid pro quo*. These had a value of $6500 or less, and therefore, would result in no increase. This would lead to an adjusted offense level of 18, and subtracting 3 points for the acceptance of responsibility would lead to a total offense level of 15 and a Guidelines range of 18-24 months.

### III.   ANALYSIS

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that this Court should consider the calculation of the advisory guidelines as set forth in the Presentence Investigation Report, the plea agreement, review all other factors, and impose a

non-custodial sentence of 5 years' probation with the first 12 months on house arrest, and a substantial fine.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). As will be discussed later, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The nature of this offense is serious. The defendant conspired with the Mayor of Reading to circumvent the fair bidding process put in place by the City of Reading in order to unfairly beat out his competitors by bribing the Mayor. Such a scheme adversely impacts not only the other parties bidding on a given contract, but the citizens, who expect that the

engineering contracts to improve their sewer systems, streets and bridges will be awarded in a fair manner to ensure the best work possible. It is difficult to call this conduct anomalous when the defendant engaged in similar conduct with the Mayor of Allentown, and expressed that he believed it was just how business was done. The defendant has, however, indicated that he was wrong to so conclude, and admitted that he should have walked away from the transactions that resulted in these charges. *See* PSR ¶ 25.

The Court must also consider the nature of the offender. The defendant is 64 years old and resides in New Jersey with his wife of 3 years. PSR at ¶¶ 46, 52. He was previously divorced and has one adult son who lives in Florida. The defendant has an undergraduate degree in agricultural engineering technology from the University of Delaware. *Id.* at ¶ 67. He completed course work for a master's degree in civil engineering, but did not complete his thesis or receive his degree. *Id.* at ¶ 68. He obtained his engineering license in 1983, which was set to expire in 2018. *Id.* at ¶ 69. The defendant has been employed since he completed his master's studies in 1978 as an engineer or business manager at various engineering firms, most recently T&M. *Id.* at ¶¶ 70-73. He has a net worth of approximately $2,000,000. *Id.* at ¶ 74. Since his 2017 resignation from T&M, he has been employed part-time by Dayton Inspection Services. *Id.* at ¶ 70. The defendant has been treated for depression since college, including for the last 10 years, with medication. *Id.* at ¶ 61. From July 2015 until December 2017, he attended bi-weekly therapy for depression and anxiety, which relates to the instant charges. *Id.* at ¶ 62. He was treated for bladder cancer in 2004 and 2009 for which he underwent surgery both times, and has been in remission since 2009. *Id.* at ¶ 59. He is currently being treated for arthritis and some non-critical conditions. *Id.* at 58. He has used marijuana occasionally

throughout his life, and tested positive at his first urinalysis with Pre-Trial Services. *Id.* at ¶ 64.

The Court should impose a sentence that will protect the public from further crimes of the defendant. Given that the defendant left his position and may be unable to renew his engineering license as a result of these charges, this is of minimal concern. In addition, the defendant is nearing retirement age.

Additionally, the Court should fashion a sentence that will provide adequate punishment, "reflect the seriousness of the offense and promote respect for the law." 18 U.S.C. § 3553(a)(2). The recommended sentence also should afford adequate deterrence to the defendant and to others who would commit a similar offense. *Id.* Clearly, crimes such as the one in which this defendant engaged not only adversely impact competitors economically, but deeply impact the public's trust in its government, and must be deterred.

Finally, in terms of avoiding unwarranted sentencing disparity, as the Court is aware, this investigation implicated the administrations of both the City of Reading and the City of Allentown, with the respective mayors of those cities engaging in substantially similar pay-to-play schemes to maximize campaign contributions utilizing the same campaign consultants. A number of individuals have been sentenced in these related cases:

Edwin Pawlowski, the former Mayor of Allentown who was found guilty on multiple counts of bribery, mail and wire fraud, and false statements by a jury on March 1, 2018, was sentenced to 15 years' incarceration.

Scott Allinson, Esq., his co-defendant, was convicted by the same jury for offering a bribe to Mayor Pawlowski and sentenced to 27 months' incarceration.

Francisco Acosta, former Reading City Council President who pled guilty to conspiracy

to commit bribery, was sentenced to 24 months' incarceration.

Rebecca Acosta, former President of the Reading School Board who pled guilty to conspiracy to solicit a bribe from Mayor Spencer, and whose suggested sentencing guidelines range was 18-24 months' imprisonment, entered into a "C" plea for 18 months' imprisonment.

James Hickey, Esq., who pled guilty to one count of honest services mail fraud and one count of honest service wire fraud for offering bribes to public officials in both Reading and Allentown, and whose suggested sentencing guidelines range was 18-24 months' imprisonment, entered into a "C" plea for 18 months' imprisonment.

Garrett Strathearn, former Finance Director for the City of Allentown who pled guilty to conspiracy to commit bribery and testified at trial against Pawlowski, received a sentence of 6 months' house arrest and 5 years' probation, pursuant to a cooperation plea agreement.

Eron Lloyd, former Special Assistant for Sustainability for the City of Reading, who pled guilty to conspiracy to commit bribery and testified at trial against Spencer, received a sentence of 5 years' probation, the first 6 months of which included home confinement, and a $7,500 fine, pursuant to a cooperation plea agreement.

Dale Wiles, Esq., former Assistant City Solicitor for the City of Allentown who pled guilty to conspiracy to commit mail and wire fraud and testified at trial as a defense witness for Pawlowski, received a sentence of one day of incarceration and 3 months' home confinement, pursuant to a cooperation plea agreement.

Francis Dougherty, former Managing Director of the City Allentown who pled guilty to conspiracy to commit mail and wire fraud and testified at trial against Pawlowski, received a sentence of 3 years' probation, pursuant to a cooperation plea agreement.

Patrick Regan, Esq., who pled guilty to conspiracy to commit mail and wire fraud and had a suggested sentencing guidelines range of 0-6 months' imprisonment, received a sentence of 2 years' probation.

## V.     CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court fashion an appropriate sentence, taking into account the Guidelines calculation by the Probation Office, the calculation set forth in the plea agreement, and other factors, and impose a non-custodial sentence of 5 years' probation with the first 12 months on house arrest, and a substantial fine.

                                        Respectfully submitted,

                                        LOUIS D. LAPPEN
                                        Deputy United States Attorney

                                        ____/s/Michelle L. Morgan_____
                                        MICHELLE L. MORGAN
                                        ANTHONY J. WZOREK
                                        Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I certify that on this day I caused a copy of the Government's Sentencing Memorandum to be served by electronic filing, and/or first-class mail, addressed to:

Judson A. Aaron, Esq.
1500 Market Street
Suite 3900
Philadelphia, PA 19102
jaaron@cogr.com

    */s/ Michelle L. Morgan*
MICHELLE L. MORGAN
Assistant United States Attorney

Dated: April 4, 2019