IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

United States of America          :

          v.                      :          No. 0313 2:17CR00129-001

Mark Neisser                      :

## DEFENDANT MARK NEISSER'S SENTENCING MEMORANDUM

Defendant Mark Neisser, through his undersigned counsel, respectfully submits this

Sentencing Memorandum for the Court's consideration.

## I.      APPLICATION OF THE SENTENCING GUIDELINES TO THIS CASE

The Government has moved for a downward departure under U.S.S.G. § 5K1.1. Mr.

Neisser respectfully urges the Court to grant the Government's motion for a downward departure

and to give him a full measure of benefit for his cooperation with the prosecution. Undersigned

counsel concurs with the Government's sentencing recommendation, that is, "a non-custodial

sentence consisting of 5 years' probation with the first 12 months on house arrest, and a

substantial fine." (Government's Sentencing Memorandum at 1.)

### A.      A downward departure should reflect that Mr. Neisser was a truthful, credible and effective witness

This Court heard Mr. Neisser testify at the trial of Vaughn Spencer. Mr. Neisser's

testimony was clear, unequivocal and honest. Mr. Neisser provided background to the jury,

explaining that it is common practice for companies seeking municipal contracts to contribute to

local elected officials and political parties so that they may be considered for such contracts. He

testified that his employer, T&M Associates, formed a Contribution Review Committee whose

members included Mr. Neisser as well as T&M's president and its General Counsel. He testified

about municipal work in Reading for which T&M bid and the contracts that T&M was or was

not awarded. He told the jury about T&M's retention of Messrs. Ruchlewicz and Fleck as

1

political consultants, and T&M's firing of them in late-2013/early-2014. He identified the speakers on the Government's audiotape recordings and his understanding of the import of the corrupt conversations on those tapes. He owned up to his offense, his agreement with Spencer and Ruchlewicz, and his participation in the conspiracy. Mr. Neisser did not embellish or testify in a way that he thought might be more likely to result in a conviction of Spencer. Given the verdict, it is apparent that the jury found Mr. Neisser to be a reliable and credible witness.

In determining the extent of a downward departure, the Court may consider not only Mr. Neisser's testimony but also his relevant conduct as compared to other defendants who are before this Court, including Cooperating Witnesses. Significantly, Mr. Neisser was consistently honest with the U.S. Attorney's Office and the FBI while, in stark contrast, the Government's charging documents reveal that several other defendants in these related cases, including Cooperating Witnesses, lied to the Government and the Grand Jury, some of them on more than one occasion. See Criminal Informations charging Eron Lloyd (Overt Acts ¶¶7, 8); Dale Wiles (Overt Acts ¶¶4, 6, 7; see also Government's Sentencing Memorandum in United States v. Dale Wiles ("In 2014 and again in 2015, the defendant attempted to conceal the steps that he and other officials took to steer contracts to Northeast Revenue, by not disclosing documents and making material false statements to the FBI.")); Mary Ellen Koval (Overt Acts ¶7); Garret Strathearn (Overt Acts ¶¶7, 8, 9; see also Government's Sentencing Memorandum in U.S. v. Garret Strathearn ("In 2014 and again in 2015, the defendant made two separate false statements to the FBI …." )); Michael Fleck (Count One ¶28, Overt Acts ¶19); and Francisco Acosta (Overt Acts ¶6).[1]

---

[1] Mr. Neisser also differs from several defendants who sold their offices as public officials, both elected and appointed. As the Government wrote in its Sentencing Memorandum in the related matter of United States v. Eron Lloyd (Criminal No. 15-560), "The Defendant, who was in a position of public trust as the Mayor's Chief of Staff, had a responsibility to ensure that the legislative process was conducted in a fair and equitable manner." A review of the charging documents reveals the following. Defendant Rebecca Acosta was an **elected official**, a member of the

## B. A substantial downward departure will further the goals of justice and the priorities of federal law enforcement

The Federal Bureau of Investigation has described public corruption as "the FBI's top criminal investigative priority." See https://www.fbi.gov/investigate/public-corruption; "FBI Announces Tip Line to Combat Public Corruption," 2014 WL 12643969 (D.O.J. Dec. 15, 2014) ("Public corruption remains a top criminal priority for the FBI. It's a breach of the public's trust by government officials .... Due to the secretive nature of bribes, such crimes are often difficult to detect and even more difficult to prove without the assistance of concerned citizens. As a result, the FBI has set up a public corruption hotline for reporting tips ..."); "Statement of Manhattan U.S. Attorney Geoffrey S. Berman on the Conviction of Norman Seabrook, President of Correction Officers' Benevolent Association," DOJ 18-281, 2018 WL 3917720 (D.O.J. Aug. 15, 2018) ("As long as there are public servants who put self-interest above the people they are sworn to serve, public corruption will remain a top priority of this Office."); McCutcheon v. Federal Election Com'n, 572 U.S. 185, 227 (2014) ("The Government has a strong interest, no

---

Reading School Board as well as a candidate for District Justice, who gave municipal bid information to a contractor in return for a campaign contribution. Defendant Francisco Acosta was an **elected official**, a member of Reading City Council who agreed to repeal the City's code of ethics in return for campaign contributions. Defendant Eron Lloyd was a **public official**, a Special Assistant to the Mayor who helped Spencer in his corrupt effort to repeal Reading's code of ethics and who also solicited campaign contributions from a vendor in return for helping the vendor get public contracts. Defendant Dale Wiles was a **public official**, a City Solicitor who manipulated the bidding process for a City revenue collection contract so that an undeserving bidder would get the award. Defendant Mary Ellen Koval was an **elected official**, a City Controller and Chair of the Parking Authority, who steered municipal contracts to the Mayor's donors. Defendant Garret Strathearn was a **public official**, a City Finance Director who manipulated the bidding process for a municipal revenue collection contract so that an undeserving bidder would get the award. Francis Dougherty, a City Managing Director, was a **public official** who helped rig a $3 million contract to replace the city's streetlights. Admittedly, public officials worked with private individuals like Mr. Neisser to accomplish their unlawful goals, but the fact is that Mr. Neisser was not among the defendant-public officials who betrayed the "public trust" of the taxpayers. A further review of the Government's charging documents reveals that other defendants, though not public officials, were private individuals who gave far more money in campaign contributions than did T&M or T&M at the behest of Mr. Neisser. Defendant Matthew McTish, president of McTish Kunkel Engineering, gave multiple campaign contributions ($1500, $1000, $2250, $2500) and discussed giving/raising $21,600 for Mayor Pawlowski, an amount that far exceeds T&M's contributions. Similarly, defendant Ramzi Haddad, an Allentown businessman, made several campaign contributions ($2500, $5000, $6500, $15,000) and pledged to raise another $25,000, an amount that far exceeds T&M's contributions. Per the Presentence Investigation Report, Mr. Neisser made no personal contributions but between 2012 and 2014 T&M made campaign contributions in Reading and Allentown totaling $7000. (See PSR, ¶¶16, 17, 19, 20, 22)

less critical to our democratic system, in combatting corruption and its appearance."); Ognibene v. Parkes, 671 F.3d 174, 186 (2d Cir. 2011) ("*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010)] confirms, yet again, that eliminating corruption or the appearance thereof is a sufficiently important governmental interest to justify the use of closely drawn restrictions on campaign contributions. This interest exists even where there is no actual corruption, because the perception of corruption, or of opportunities for corruption, threatens the public's faith in democracy.").

To successfully prosecute corruption matters, the Government routinely relies upon cooperating witnesses such as Mr. Neisser. The Government often urges that sentencings should send an admittedly valid message that public corruption will be prosecuted and punished. But Mr. Neisser's sentencing can send an equally important message: that sentencing courts will confer a significant benefit upon those who substantially assist law enforcement in prosecuting the most culpable elected officials. It is a message that will enable the Government to continue to obtain the cooperation it needs to successfully prosecute public corruption cases, which are some of the most difficult cases for the Government to obtain trial convictions. Some recent, high-profile political corruption trials illustrate how challenging these cases can be for the Government. A recent public corruption prosecution in the Middle District of Pennsylvania, United States v. Charles Ireland (1:16-cr-00203), was dismissed mid-trial because the Court found the Government had not established that the charged "pay-to-play" activity, involving the state Treasurer and a businessman seeking state contracts, had crossed the line into unlawful *quid pro quo* activity. Similarly, the 2017 corruption trial of New Jersey Senator Robert Menendez (no. 15-CR-155, D.N.J.), who was charged with giving political favors in return for substantial political contributions, ended in a hung jury and a decision by the Department of Justice not to retry the case. And, in the federal corruption (bribery) prosecution of Virginia Governor Robert

McDonnell, the Supreme Court overturned his trial conviction and the Department of Justice declined to retry the case. See Robert McDonnell v. United States, 579 U.S. __ (2016).

A substantial downward departure under U.S.S.G. § 5K1.1 will further law enforcement's "top criminal investigative priority" by sending a message that those who substantially assist the Government in ferreting out public corruption will receive a substantial benefit in the form of a downward departure motion from the Government and a reduced sentence from the Court. Such a sentence will do no harm to the other important message, that public corruption will be investigated and punished.

## II. APPLICATION OF THE § 3553(A) SENTENCING FACTORS TO THIS CASE

In United States v. Gall, the Supreme Court explained:

> [T]he Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, he may not presume that the Guidelines range is reasonable.

552 U.S. 38, 49-50 (2007). Consistent with the Supreme Court's directive, the Third Circuit has instructed that "[i]n the wake the Supreme Court's ruling in Booker … district courts must give 'meaningful consideration to the § 3553(a) factors in arriving at a reasonable sentence." United States v. McCrae, 216 F. App'x 187, 188 (3d Cir. 2007) (quoting United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006)). Sentencing courts are "required to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines." United States v. Floyd, 499 F.3d 308, 311 (3d Cir. 2007) (quoting United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006)). A sentencing court, without granting a traditional Guidelines "departure," may still grant a "variance" based on the § 3553(a) factors. Id. (citing United States v. Vampire Nation, 451

F.3d 189, 195 (3d Cir. 2006) (adopting distinction between departures under the Guidelines and variances under § 3553)). In <u>Gall</u>, the Supreme Court expressly rejected a "rule that requires 'extraordinary' circumstances to justify [a variance to] a sentence outside the Guidelines range." 552 U.S. at 47.

The Government has moved for a traditional Guidelines departure under U.S.S.G. § 5K1.1. Application of the § 3553(a) factors also warrants a variance in this case. In fashioning an appropriate sentence, Mr. Neisser respectfully requests that the Court consider not only the Government's pending downward departure motion but also the statutory sentencing factors.

### A.     18 U.S.C. § 3553(a)(1) – The Nature of the Offense

Section 3553(a)(1) provides that the sentencing court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant."

### 1.     The Nature and Circumstances of the Offense

Mr. Neisser understands the seriousness of public corruption offenses and acknowledges his role in his criminal offense. Still, because "the nature and circumstances of the offense" is a § 3553 consideration, it is important to note that when T&M decided to pursue municipal contracts in Allentown and Reading, Mr. Neisser did not set out to obtain those contracts by bribing public officials. As Mr. Neisser told the Probation Officer, and as he testified to the jury, it has been his experience that a company seeking to obtain municipal contracts must in many cases make political donations to the appropriate politicians or political parties to be invited to bid, or to be considered for a contract award. (<u>See</u> PSR at 8-9) Courts have held that this, in and of itself, is not unlawful, because that situation presents no *quid pro quo*. <u>See</u>, <u>e.g.</u>, <u>United States v. Menendez</u>, 291 F. Supp. 3d 606, 624 (D.N.J. 2018) (bribery requires a quid pro quo, and a quid pro quo with respect to political contributions must be "explicit," meaning the "payor and payee were aware of its terms"); <u>United States v Bryant</u>, 655 F.3d 232, 244-25 (3d Cir. 2011) ("[N]ot

every payment made to a public official constitutes a bribe. A payment made in a general attempt to build goodwill or curry favor with a public official, without more, does not constitute a bribe."); United States v. Pawlowski, 351 F. Supp. 3d 840, 871 (E.D. Pa. 2018) (Sanchez, J.) (Your Honor held that, "At most, the evidence suggests that Saidel and Wieand agreed to contribute to Pawlowski in exchange for the possibility of receiving unspecified legal work from the City at some point in the future. While such evidence may support a finding of a quid pro quo agreement in the non-campaign contribution context, more is required in the campaign contribution context."). This sad state of business and political affairs was recently recognized by the Honorable John E. Jones, III in *United States v. Richard W. Ireland*, a public corruption/bribery case in the Middle District of Pennsylvania.

> The scenarios that repeatedly played out in this case, I am moved to say, are a product of the Commonwealth of Pennsylvania's highly deficient campaign finance laws. These are the laws that allow unbridled and unlimited campaign contributions to office-seekers and officeholders from individuals desiring to do business with the Commonwealth in one way of the another. And after sitting through this trial, we seriously question the wisdom of a system that allows candidates, for example, for state treasurer … to solicit contributions from individuals and entities that seek to invest those [state treasury] funds for profit in their private businesses.

(Transcript of Jury Trial Proceeding, March 27, 2017 (granting, from the bench, defendant's Rule 29 motion to dismiss the indictment)). As one high profile political consultant, former Philadelphia Mayor Ed Rendell, was quoted regarding his role in introducing his clients to public officials: "You have every right to contribute to the mayor's campaign, but you have no right to expect you're going to get the contract. It can help, but it's not a guarantee." (https://whyy.org/articles/pay-to-play-rules-elude-most, January 25, 2016)

Here, whereas Mr. Neisser was initially involved in his company's lawful decision to retain political consultants and give campaign contributions in a region where they hoped to obtain municipal work, Mr. Neisser ultimately entered into an unlawful *quid pro quo* agreement.

7

Set forth below is a summary of the history of the relationship between Mr. Neisser and Messrs. Fleck and Ruchlewicz, prior to the fall of 2014 when Mr. Neisser engaged in the recorded conversations with Ruchlewicz and Spencer (that is, the conversations that were the focus of Mr. Neisser's trial testimony).

**T&M regularly contributes to public officials and political parties
in areas where it seeks to do business**

At trial, both the Government and defense counsel asked Mr. Neisser about contributions that his former employer, T&M, regularly makes to elected officials and political parties. The following facts should not be in dispute, as much of the following information is reflected in Mr. Neisser's trial testimony or was elicited from him at pretrial proffers and prep sessions.

Even prior to entering the Lehigh Valley to pursue business, Mr. Neisser's employer, T&M Associates, regularly contributed to elected politicians and political parties in towns where T&M sought to obtain contracts. (See, e.g., www.courthousenews.com, August 23, 2018, reporting on Mr. Neisser's trial testimony: "At the time, Neisser was on a committee within T&M specially created to award money to political campaigns.") T&M's business strategy of contributing to politicians was so integral to its business that T&M formed a Contribution Review Committee (long before Mr. Neisser was employed at T&M) which consisted of its president Mr. Dahms, its General Counsel Mr. Valenti, Mr. Neisser, and a few other employees. T&M budgeted its political contributions by county, the monetary amount depending on factors such as the amount of work T&M had obtained in the county, the potential for growth there, and the amount of work awarded to other companies there. Each year, T&M's president asked all client managers to develop a political budget for municipalities and other public bodies where they had or sought to do business. Employees who wanted T&M to make political or civic contributions would complete a company form called a Contribution Review Committee

Request, and the Committee would meet to discuss and approve such requests.[2] With respect to T&M's contributions to Mayor Spencer, these were initially requested by other T&M employees and later also requested by Mr. Neisser, and all such requests were reviewed by T&M's Contribution Review Committee and finally approved by T&M's president.

Internally, T&M made no secret of its corporate policy to make political contributions where it sought to obtain contracts. For example, attached at Exhibit A is a T&M document entitled *Pennsylvania – Final Budget 2014*, which lists the company's almost $50,000 budget for political contributions in Reading, Allentown, several Pennsylvania counties, and "State Level." Similarly, T&M's anticipated political contributions in Pennsylvania for the following year are detailed in another T&M document entitled *Pennsylvania – Budget 2015*, also attached at Exhibit A. T&M unabashedly described the company's reasons for making political contributions: "With 2015 being a local election year, it is an important time to evaluate our support [read, political contribution] levels in those areas where we have, or are seeking to increase our market presence." *T&M's Narrative Description of 2015 PA Support Budget*, attached as Exhibit B (a document not prepared by Mr. Neisser). To give the Court a sense of T&M's program of political contributions, attached as Exhibit C are forms that T&M filed annually with the New Jersey Election Law Enforcement Commission, reflecting annual "total[s] of reportable contributions made to candidates or committees" of well over $350,000 in 2014, 2015 and 2017, respectively.

Obviously, T&M contributed to certain elected officials not because T&M was committed to their civic policies regarding local schools, parks & recreation, trash removal and

---

[2] Attached as Exhibit A is an exemplar *T&M Contribution Review Committee (CRC) Request* form, submitted in late-2014 not by Mr. Neisser but by another T&M employee. The form requires the employee to check off, *inter alia*, the Event Type (in this form, "Political"), the Contribution Type ("Political Contribution"), the Political Party ("D," for Democrat), and the Total Amount Requested ($500).

the like; but rather, because T&M believed its contributions increased the likelihood that it would be awarded engineering contracts in those localities. (See Ex. B, *T&M's Narrative Description of 2015 PA Support Budget*) When T&M entered the Allentown/Reading market, T&M's president, its General Counsel, and other T&M employees including Mr. Neisser understood the Contribution Review Committee would approve contributions to local officials to enhance the chance T&M would at least be considered for municipal contracts. That understanding was not a secret, but more to the point, it was not, in and of itself, unlawful. See Citizens United v. FEC, 558 U.S. 310, 360 (2010) ("Ingratiation and access … are not corruption"); see also U.S. v. McDonnell, 2014 U.S. Dist. LEXIS 166390, at *8 (E.D. Va. Dec. 1. 2014) ("Admittedly, mere '[i]ngratiation and access' may not alone create a quid pro quo agreement within the meaning of the bribery statutes."); McCutcheon v. Federal Election Com'n, 572 U.S. 185, 208 (2014) (citing Citizens United, 558 U.S. at 360 ("And because the Government's interest in preventing the appearance of corruption is equally confined to the appearance of quid pro quo corruption, the Government may not seek to limit the appearance of mere influence or access.").

### T&M retains Fleck and Ruchlewicz as consultants in Reading and Allentown

During his interviews and at trial, Mr. Neisser spoke about the decision of his employer to use Michael Fleck and Sam Ruchlewicz as paid consultants for engineering work that T&M hoped to obtain in the Lehigh Valley, and T&M's subsequent termination of them. The following facts should not be in dispute.

It is common for engineering firms that seek public and private contracts to the hire consultants who know the local business and political landscape and who can make introductions. In late 2011, Mr. Neisser, along with T&M's president, met with Fleck, a political consultant in the Allentown area who said he could give T&M guidance and help it make

connections in the Lehigh Valley for public and private work. Messrs. Dahms and Neisser told Fleck that all dealings must be above-board. Mr. Neisser specifically told Fleck that T&M would not ask him for help pursuing work in Easton because Fleck was a councilman there. (Mr. Neisser did not solicit Fleck's help in Easton and to Mr. Neisser's knowledge, Fleck did not assist T&M there.)

At some point, Fleck brought in Ruchlewicz to work with him. Mr. Neisser and other T&M employees had regular meetings with Messrs. Fleck and Ruchlewicz, who suggested that T&M contribute to Vaughn Spencer's mayoral campaign and others. Mr. Neisser attended some but not all of these meetings. Mr. Neisser met with Mayor Spencer just twice; for a minute or two at Spencer's inauguration in January 2012, and then at the November 24, 2014 lunch that was recorded by Ruchlewicz and that was a focus of Mr. Neisser's trial testimony. Mr. Neisser was not involved in preparing T&M's bids for Reading projects.

### T&M's firing of Fleck and Ruchlewicz in early 2014

In early 2014, T&M stopped using the services of Fleck and Ruchlewicz because Mr. Neisser and other T&M employees believed they were unknowledgeable and ineffective. For example, in July 2013, Fleck and Ruchlewicz advised T&M to make a $1000 contribution to Mayor Spencer, specifically, to *Citizens for A Greater Reading*. After making the $1000 contribution, T&M learned that Reading ordinance limited such a contribution to $500, which caused T&M to be concerned about the knowledge and expertise of their consultants. Further, in late-2013/early-2014, Fleck and Ruchlewicz made a rambling and unimpressive presentation at a T&M company-wide marketing meeting that caused T&M employees to question their value and integrity as consultants. In early 2014, Mr. Neisser, along with T&M's president Mr. Dahms, met with Mr. Fleck and told him that their services were no longer needed. Mr. Neisser and his boss fired Fleck and Ruchlewicz.

Mr. Neisser had virtually no contact with Ruchlewicz for almost a year – from early 2014 when Fleck and Ruchlewicz's consulting services were terminated, until the fall of 2014 when Ruchlewicz, now a cooperator, reached out to Mr. Neisser. Of course, Mr. Neisser and Mr. Ruchlewicz reconnected and, along with Spencer, engaged in the *quid pro quo* conspiracy.

### Mr. Neisser was not the aggressor in the improper relationship with Mr. Ruchlewicz and Mayor Spencer

At the trial of former Mayor Spencer, Mr. Neisser testified about the recorded conversations between him, Ruchlewicz and Spencer. These recordings were the cornerstone of that portion of the charges against Spencer. The recorded conversations evidence Mr. Neisser's role in the charged conspiracy. The recorded conversations also evidence that it was Mr. Ruchlewicz who pursued Mr. Neisser, not the other way around. This does not excuse Mr. Neisser's criminal conduct, but facts do matter and counsel respectfully submits that in fashioning an appropriate sentence this Court should consider the factual "nature and circumstances" of Mr. Neisser's role in the offense, per 18 U.S.C. § 3553(a)(1).

As discussed above, after Mr. Neisser and T&M's president terminated Fleck and Ruchlewicz in early 2014, Mr. Neisser had no contact with them for several months. Later in 2014, Ruchlewicz (who was by now working with the FBI) called T&M's president Mr. Dahms to ask for campaign contributions, but Mr. Dahms would not take Ruchlewicz's call and he instructed Mr. Neisser to return the calls. On October 30, 2014, it was Ruchlewicz who called Mr. Neisser to discuss T&M completing its financial "commitment" to Mayor Spencer for the year. On October 31, 2014, it was again Ruchlewicz who called Mr. Neisser to let him know that Ruchlewicz had "set up a statewide PAC" as a "funding mechanism." On November 5, 2014, it was Ruchlewicz and Mayor Spencer who sought contact with Mr. Neisser to discuss the need for

T&M to financially support the Mayor. The November 24, 2014 lunch meeting between Ruchlewicz, Spencer and Mr. Neisser was arranged by Ruchlewicz.

T&M was awarded municipal contracts in the Lehigh Valley, as reflected in the Presentence Investigation Report. But it should not be disputed that T&M was not awarded several municipal contracts in Reading for which it bid: a December 2011 submission for Sewer Flow Meter Inspection and Evaluation at Municipal Connection Points; a November 2012 submission for Improvements to the Fritz Island Wastewater Treatment Plant; a September 2013 submission for Engineering Services For Sanitary Sewer Collection System; and a December 2014 submission for 6th & Canal Pump Station, Long-Term Improvement Project.

The sentence must reflect "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1). The foregoing facts reflect that Mr. Neisser was at times ambivalent about his involvement with Fleck and Ruchlewicz and was not the aggressor in the conspiracy. Mr. Neisser's nephew, Richard Welsh, Esq., articulated it well in his letter to the Court: "If Mark is guilty, as he concedes, it is largely because he was a reluctant, albeit willing, player in a corrupt game." (Ex. D) Or, as Probation writes, Mr. Neisser "relent[ed] to the pressure that he received" from elected officials and their subordinates. (PSR ℙ15)

## 2. "The History and Characteristics of the Defendant"

Section 3553(a)(1) further requires a sentencing court to consider the history and characteristics of the defendant.

### (a) The numerous attestations to Mr. Neisser's good character

Numerous friends, business associates and family members have written letters Court expressing their collective view that Mr. Neisser has always conducted business honestly and ethically over the years, has generously volunteered his services to charitable causes and to his community, and can be counted on to help those in need.

Considering that this case involves public corruption, it is notable that several elected and appointed government officials have asked that the Court consider Mr. Neisser's ethical conduct and good character over the years they have known him.

Peter McDonough, a Professor at Rutgers University, and a former cabinet member to New Jersey Governor Christie Whitman, writes that he has known Mr. Neisser for nearly 20 years "as a person of solid character and one with a commitment to community that is laudable." (Ex. D) As is discussed in more detail below, Professor McDonough has even offered to help Mr. Neisser find organizations to which he can make presentations on the pitfalls of those in the municipal contracting industry making political contributions and the consequences of crossing the line. An elected official, Delaware State Senator Colin Bononi, writes that he has known Mr. Neisser for over 20 years and "in the dozens of business meetings I've had with Mark over the years, not once did he act, or even faintly suggest acting, in any way illegal or untoward." (Ex. D) Yet another elected official, William Orth, a Pennsauken Committeeman, the former Mayor of Pennsauken, and Executive Director of the Pennsauken Sewage Authority, writes that for nearly 30 years he has known Mr. Neisser to be honest in his professional dealings. "While representing his firm's efforts in numerous appointments and assignments, Mark became part of our Pennsauken family. We trusted him to do what was right and fair for the Township, and he always delivered. He conducted himself professionally and honestly never with the slightest hint of impropriety." (Ex. D)

Kenneth LeFevre, a former elected official who was an Atlantic County Freeholder and a New Jersey State Assemblyman, writes that he reported directly to Mr. Neisser while working as a consultant for T&M. Mr. LeFevre vouches that he found Mr. Neisser "to be honest, reliable, [with a] great work ethic, conscientious, caring and courteous. In addition, I found him to be so well-respected in his field by all those that he dealt with. Never did Mark say or do anything that

14

I believed was off color or crossed the line." (Ex. D) Wayne Hasenbalg, an attorney, former staff member of two New Jersey Governors, and former Chief of Staff at the New Jersey Office of the Attorney General, writes of the 15 years that he interacted with Mr. Neisser who was representing his former employer, T&M Associates: "In that capacity I had many instances where I dealt directly with Mark along with countless interactions with him and governmental officials in furtherance of the business interests of T&M. I never experienced any instance where I might have felt that ethical guidelines were being compromised." (Ex. D) James MacFarlane, a former client of Mr. Neisser's and a 22-year Commissioner of the Municipal Utilities Authority of Camden County writes: "My colleagues and I found Mark to be trustworthy to the extent that we relied upon his professional opinion to deliver work product of the highest order. In his capacity as a Civil Engineer I can vouch that Mark is regarded highly among his fellow Engineers." (Ex. D)

It is striking that elected and appointed government officials – including a Governor's cabinet member, a state Senator, a town Mayor, a state Assemblyman, a former Gubernatorial staff member and Chief of Staff at the Attorney General's Office, and a longtime Commissioner of a municipal Authority—all of them knowing that Mr. Neisser has pled guilty to a public corruption offense—have attested to Mr. Neisser's honesty and ethics in their professional dealings with him over decades.

Others speak of the unflagging support that Mr. Neisser provided when their family members were ill or had fallen on tough times. A former employee of Mr. Neisser's writes: "[When] my son was being dropped from insurance [] Mark was always by my side, he made several phone calls, helped me thru the red tape and kept telling me not to worry." (Ex. D, letter or Julia Schaub) A former colleague writes: "[Mark] displayed a consistent caring manner towards me during some difficult personal times. Such times included his offer to help obtain the

proper doctors to treat my son, Brandon, who has been disabled due to an illness." (Ex. D, letter of Mark Hansen) State Senator Bonini writes: "I have seen Mark's extraordinary character and good heartedness in how he treated and helped the children of his colleague Henry Chudzinski when Henry passed away a few years ago. Mark was there for Henry's children both financially and as a mentor and friend. Mark really went above and beyond …." (Ex. D) Another former work colleague writes that Mr. Neisser went out of his way to place his son in an "invaluable" internship, and that Mr. Neisser also "chauffeured me around when I was in a true bind," having had his license suspended. (Ex. D, letter of Keith Lieberman)

Still others write of Mr. Neisser's attributes as an employer, "mentoring" non-performing employees and giving then "second chances," (Ex. D, letter of James Duffy), and "provid[ing] guidance on professional and personal matters" to his employees (Ex. D, letter of Rohan Tadas). A former employee of Mr. Neisser's speaks of his generosity to his employees in their times of need: "Another example of his concern for others was when Mark discovered the company's health insurance did not cover certain circumstances he arranged for reimbursements for me, and at least one other employee that I know of. He also supported fully paying the salaries of at least two employees during their extended periods of illness." (Ex. D, letter of William E. Alburger)

Additionally, work colleagues and business associates ask that the Court consider Mr. Neisser's good professional business ethics that they have witnessed over long periods of time. Kevin Toolan, the former CEO of T&M who worked with Mr. Neisser for eight years, writes: "I have always known Mark to have exemplified the highest ethical standards. He has always shown the strongest personal character." (Ex. D) Richard Rehmann, president of a competitor of Mr. Neisser's former company, writes glowingly of Mr. Neisser and attests that although he is aware of his conviction, "[m]y opinion of Mark remains unchanged as I base it on a broader set of experiences, conversations and witnessed behavior." (Ex. D) Long-time colleague George

Scott writes: "Mark always preached to me that success in this business could only be sustained by staying true to your character, and being able to walk away when you sensed nefarious motives in others …. I never once heard Mark suggest, indicate, hint, or even dance around – behaving in a way that not only stepped outside the confines of the law, but of personal ethics or moral fiber. **Time and time again, Mark would exclaim, it is better to walk away and lose your client, than do something with even the appearance of impropriety and lose everything**." (Ex. D, emphasis added.) George Scott accurately views Mr. Neisser's current predicament as an aberration in a work life that was otherwise, as Mr. Scott describes it, ethical and moral.

The numerous attestations of those who best know Mr. Neisser – long-time friends, business associates, family members, and even elected and appointed government officials – are the best evidence of Mr. Neisser's stellar personal characteristics. In fashioning an appropriate sentence, this § 3553 factor, "the history and characteristics of the defendant," weighs heavily in Mr. Neisser's favor.

(b)     Mr. Neisser's community service and volunteer activities

Mr. Neisser has for many years volunteered significant time to his community.

• For five years, Mr. Neisser volunteered to serve on the Evesham Township Planning Board. For two of those years he was Chairman. Among other things, he reviewed developers' plans to ensure they were in conformance with local ordinances and state laws. Mr. Neisser's experience as a civil engineer was valuable in developing a new town masterplan.

• Mr. Neisser's community further benefitted from his engineering expertise through his several years of volunteer membership on the board of the Evesham Township Municipal Utilities Authority. Mr. Neisser also served as chair of that board. Mr. Neisser's expertise in

wastewater collection/treatment allowed him to assist the Authority in making decisions on treatment plant upgrades, regional water issues and day-to-day operational issues.

• For the Juvenile Diabetes Foundation, Mr. Neisser served as Chair of the Burlington County and Camden County Walkathon fundraiser. He was responsible for finding volunteers and donors and coordinating the events. (See Ex. D, letter of Julia Schaub.)

• Mr. Neisser was a member of the Jewish Camden Partnership, even serving as its president. The Partnership was formed to develop and implement assistance programs in Camden, NJ. In that capacity, Mr. Neisser mentored high school graduates who had enrolled in a business program designed to help them learn how to start their own businesses. Mr. Neisser, who had years of experience running his own business, assisted these youth in developing business plans. For example, Mr. Neisser assisted one young mentee with his plan to open a travel agency. Mr. Neisser also planned two successful golf outings to raise money for the Partnership. (See Ex. D, letter of James MacFarlane, writing that "Camden, NJ is one of the most challenged Cities in the entire United States; it is people like Mark who give of their time and talent generously that are meaningfully helping those among us who are in most need;" see also Ex. D, letter of Robert Wagner, former member of Pennsauken School Board, who writes that Mr. Neisser helped prepare "non-college bound students to prepare for careers in carpentry, plumbing, and electrical").

• Habitat for Humanity is an organization that utilizes volunteers to build homes for families that meet certain criteria. Employing his engineering and carpentry skills, Mr. Neisser helped build homes for the organization. Before recently moving to Margate, Mr. Neisser volunteered his time at the organization's "Restore" stores. (See Ex. D, letters of Frederic Brotz and Edwin Steck.) Similarly, Mr. Neisser has recently used his skills to help at a synagogue in Ventnor where he now lives. The rabbi has written that he could identify others whom Mr.

18

Neisser could assist as part of a community service requirement. (See Ex. D., letter of Avrohom Rapoport)

• Mr. Neisser recently signed to assist at JCC events in his community. The JCC is a service organization that employs volunteers to deliver meals to the elderly, transport elderly persons to and from their doctor appointments, and assist with the organization's various programs and events. Despite knowing that sentencing looms, Mr. Neisser continues to volunteer as he always has.

• Mr. Neisser regularly donates platelets and plasma at the American Red Cross. Mr. Neisser has a rare blood type and therefore his blood donation is particularly valuable. Indeed, Kenneth LeFevre writes that when he recently called Mr. Neisser about his character letter, Mr. Neisser was donating blood – "as I found out, he does it regularly." (Ex. D)

Friends and business associates have also written of Mr. Neisser's commitment to charitable causes. Sen. Bonini writes that he has seen Mr. Neisser "open his wallet" to many good causes. (Ex. D) Former Mayor William Orth writes that "Mark has participated in many charitable events run by the Township or me personally. He never hesitated to volunteer his time, his firm's equipment and personnel, and donate to the causes." (Ex. D) A long-time work colleague, Antoinette Whitney, writes that Mr. Neisser's "charitable work was extensive. He participated in and helped lead our [company's] many food and toy drives, benefit walks for the Juvenile Diabetes Research Fund, Multiple Sclerosis Association of American, and other similar events assisting the local community. His passionate support of these causes shows his charitable nature and is one of his many notable qualities." (Ex. D) Mr. Neisser's character is reflected in his extensive and longstanding volunteer activities in the community.

### (c) Mr. Neisser's plan to educate others about misconduct in the municipal contracting industry

At around the time of his guilty plea Mr. Neisser had an idea; to develop a presentation that he could make to others in the municipal contracting industry, a presentation that he calls "Navigating the Troubled Waters of Pay-to-Play." (See Exhibit E hereto.) Mr. Neisser desires to tell others who seek public contracts about his offense, the illegality of such conduct, the consequences of a prosecution, and how to identify and avoid questionable situations. Mr. Neisser believes that through such a presentation he can steer others clear of impropriety in bidding for municipal contracts, especially given the widespread practice of bidders contributing to elected officials. Mr. Neisser has deep connections in his industry and he believes companies would be receptive to such a presentation, particularly with the current focus on corporate compliance. Being a prime example of what happens to those who cross the line, Mr. Neisser believes such a presentation by him would be particularly compelling. Mr. Neisser has drafted a proposed presentation entitled *Navigating the Troubled Waters of Play-to-Play*. Attached as Exhibit E is a detailed albeit condensed outline of Mr. Neisser's proposed presentation (to be supplemented by a PowerPoint presentation).

Mr. Neisser's proposed program is not "pie in the sky;" to the contrary, there is precedent for such a program to be presented by a convicted individual such as Mr. Neisser. By way of example, the Association of Certified Fraud Examiners ("ACFE") regularly utilizes convicted individuals "for training and educational purposes because we believe that there is no better way to learn about fraud than from a person willing to describe how and why their crimes occurred." (See https://www.acfechapternews.com/acfechapternews/2014/3/19/reminder-of-the-use-of-convicted-fraudsters-for-training) The ACFE recently presented a training program featuring an interview with Greg Yates, who had been convicted of defrauding a federal business loan

program, during which he spoke about his offense and the aftermath of his conviction. (See https://www.acfe.com/fraud-examiner.aspx?id=4295001877). At its 2018 national conference, the ACFE presented a program featuring Andrew Fastow, former CFO of Enron who was convicted of securities fraud, to present about "what questions corporate directors, management, attorneys, fraud examiners and auditors should ask, in order to ensure that their companies not only follow the rules, but uphold the principles behind them." (See https://houstonacfe.org/Fraud_Conf_Speakers) The ACFE's Global Fraud Conference featured Ryan Homa, convicted for his participation in a business fraud scheme, who spoke about "the environment in the business, his crimes and how his theft could have been thwarted." (See https://www.fraudconference.com/29annual/Closing-Session.aspx) On a more local level, Nathan Mueller, a CPA who was convicted of embezzlement, presented to businesspersons in Eau Claire, Wisconsin, about "how to detect employee fraud." (See https://www.weau.com/content/news/Man-convicted-of-embezzling) Further by way of example, a recent article in The Wall Street Journal reported about John Ponder, who, upon being released from prison, "reached out and gained the support of the FBI agent who had arrested him, the U.S. Attorney who prosecuted him and the judge who sentenced him," and founded Hope for Prisoners, an organization that has helped numerous ex-offenders successfully rebuild their lives. (Wall Street Journal, *Even the Fiercest Social-Justice Warrior Should Learn Mercy*, February 29, 2019.)

Attached at Exhibit D is a letter from Peter McDonough, a professor at the Eagleton Institute of Politics at Rutgers University, formerly Executive Director of the NJ General Assembly, Chief of Staff for a United States Congressman, and a member of New Jersey Governor Christie Whitman's cabinet. Professor McDonough writes that having observed the process of obtaining municipal contracts, he is aware that "[t]he common belief among potential

contractors is that contributions must be made, directly or indirectly in order for the municipal contract to be considered or awarded." Professor McDonough writes that he endorses Mr. Neisser's proposed program and could assist in arranging presentations:

> Requiring Mr. Neisser to speak to gatherings or meetings of public vendors and tell his story about how he was drawn into making unlawful campaign contributions, would serve as a lesson to other vendors; and it would provide a real-world teachable moment for vendors in a system where there is pressure to make political contributions in order to be considered for municipal contracts. As examples, such a program could include speaking at county or statewide engineering society meetings. It could include speaking to other professional associations for the types of vendors who typically do business with state, county and local governments. It could include testifying before legislative committees to explain how the system that was intended to curb "pay to play" has not lived up to its goals.

> Mark has discussed his proposed program with me and has even shared a draft written program description. I would gladly help Mark finalize a program with more detail. In my capacity as a Professor, I would assist Mark in setting up talk to students at the Eagleton Institute/Rutgers University. Due to my current and past positions, I know quite a few professors at other universities and colleges, and would assist Mr. Neisser in finding appropriate audiences.

Mr. Neisser hopes the Court will consider a significant community service requirement including that Mr. Neisser contact municipal contractors and professional associations to make his proposed presentation about the perils of political contributions in the municipal contracting industry. Undersigned counsel also has professional contacts through which he could assist Mr. Neisser in identifying appropriate audiences for such a presentation. Such a valuable community service requirement would not be unprecedented.

(d)     Mr. Neisser's demonstrated commitment to moving forward

Since pleading guilty, Mr. Neisser has remained employed. He has worked part-time preparing inspection reports for an inspection services company, and he has also worked part-time for an auto parts company. Recently, the Neissers started a handyman business, with Mr. Neisser performing the labor and Mrs. Neisser handling administrative duties. Although the wage is not great, hours are not guaranteed, and there are no health or other benefits, Mr. Neisser

is determined to remain employed and provide for himself and his wife. Where many others in his position would simply give up, Mr. Neisser continues to move forward. Mr. Neisser hopes that this Court will give him the opportunity to continue to be a productive member of society.

### Mr. Neisser's "history and characteristics" weigh in his favor

Under 18 U.S.C. § 3553(a), the history and characteristics of the defendant should be carefully considered at sentencing. United States v. McCrae, 216 F. App'x 187, 188 (3d Cir. 2007) (quoting United States v. Cooper, 437 F.3d 324, 329 (3d Cir. 2006)). As detailed above, Mr. Neisser's good character is reflected in the favorable attestations written by friends, business associates and colleagues who know him best, his history of volunteerism and community engagement, his well-developed plan to warn others of the risk of corruption in municipal contracting, and his demonstrated commitment to remain a productive member of society. This statutory sentencing factor, "the characteristics of the defendant," weighs heavily in Mr. Neisser's favor.

### B. 18 U.S.C. § 3553(a)(2)(A) – A Sentence Reflecting the Seriousness of the Offense

Section 3553(a)(2)(A) provides the Court shall consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Undersigned counsel concurs with the Government's sentencing recommendation, that is, "a non-custodial sentence consisting of 5 years' probation with the first 12 months on house arrest, and a substantial fine." (Government's Sentencing Memorandum at 1.)[3] To impose such a sentence would not be tantamount to "letting him off easy." In United States v. Gall, the Supreme Court recognized the restriction of freedom that results even from a probationary sentence:

---

[3] The defense also concurs with the Government's sentencing calculation analysis as set forth in the Government's Sentencing Memorandum at pp.6-7.

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantively restrict their liberty. Probationers may not leave the judicial district, move or change jobs without notifying and in some cases receiving permission from their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the Court.

552 U.S. at 48 (internal citations omitted) (holding the district court did not err in imposing probation; defendant had insignificant criminal history, was not an organizer, used no violence, and provided agents with truthful information about his offense although he did not receive a downward departure motion from the Government).

Both the Supreme Court and the Third Circuit have written that even probation is a restriction on one's freedom. See United States v. Knights, 534 U.S. 112, 119 (2001) ("[i]nherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'"); Frank v. United States, 395 U.S. 147, 151 (1969) ("probation is, of course, a significant infringement of personal freedom"); Fernandez v. City of Elizabeth, 468 Fed. App'x 150, 154 (3d Cir. 2012) ("probation constitutes an 'unfavorable' period of judicially imposed limitations on freedom"); United States v. Tomko, 5632 F3d. 558, 573 (3d Cir. 2009) ("quantifying the variance as a certain percentage of the … sentence recommended by the Guidelines gives no weight to the 'substantial restriction of freedom' involved in a term of supervised release or probation") (quoting Gall, supra); Gilles v. Davis, 427 F.3d 197, 211 (3d Cir. 2005) ("probation constitutes an 'unfavorable' period of judicially imposed limitation of freedom"); see also *Advisory Council of Judges on National Council on Crime and Delinquency, Guides for Sentencing* 13-14 (1957) ("Probation is not granted out of a spirit of leniency …. As the Wickersham Commission said, probation is not merely 'letting an offender off easily"

(quoted with approval in <u>Gall</u>, 552 U.S. at 48 n.4). Similarly, in <u>United States v. Tolla</u>, the Second Circuit wrote of the real punishment that results even from a probationary sentence:

> [W]e cannot ignore the not incidental deterrent and retributive impact of commonly accepted conditions of probation. Such conditions include requirements of substantial hours of community service (at work that is often drudgery), payment of money to a victim for restitution, frequent reports to probation officers, restrictions on travel and the like. Moreover, probation itself contains elements of punishment in the restraints imposed upon the freedom of the individual, such as requirements that the probationer may not travel outside the area of the District Court without permission, must work regularly at a lawful occupation, must keep "reasonable hours," must not associate with "undesirable persons," and must follow the Probation Officer's instructions ….In other words, probation and well-accepted conditions thereto may well have inherently punitive and retributive aspects, even though they are generally regarded as having rehabilitation as their primary purpose.

781 F.3d 29, 35 (2d Cir. 1985) (internal citation omitted).

Here, the sentence recommended by the Government, with which the defense concurs, would "offer[] a … unhardened offender an opportunity to rehabilitate himself without [lengthy] institutional confinement under the tutelage of a probation official and under the continuing power of the court to impose institutional punishment for his original offense in the event that he abuse this opportunity." <u>Roberts v. United States</u>, 320 U.S. 264, 272 (1943). A lengthy jail sentence is not required to "promote respect for the law" or to "provide just punishment for the offense."

In its Sentencing Memorandum in the related case of <u>United States v. Dale Wiles</u> (Criminal No. 15-561), the Government addressed the issue of the "relative culpability" of various defendants:

> Finally, the Court should avoid unwarranted sentencing disparities. The Court will shortly sentence Garret Strathearn, who was this defendant's immediate supervisor and directed him to engage in the offense conduct. In addition, there are two other defendants in this case who, like the defendant, were attorneys with commensurate ethical obligations. James Hickey, [an attorney] who did not cooperate, and whose conduct involved actively paying bribes and educating others on how to engage in bribery, which was captured on numerous recordings, pled guilty and was sentenced by this Court to 18 months' incarceration, pursuant to a Rule 11(b)(1)(C) plea agreement. Patrick Regan, who did not cooperate, and

whose conduct involved actively paying bribes to secure an extremely lucrative city contract for his energy company, was sentenced by this Court to probation. The Court should take these sentences, and this defendant's relative culpability, into account in fashioning an appropriate sentence.

Here, the sentence recommended by the Government, with which the defense concurs, is supported by the need to avoid unwarranted sentencing disparities and considerations of "relative culpability," to use the Government's phrase.[4]

### C. § 3553(a)(2)(B) – Deterrence

Section 3553(a)(2)(B) provides that the Court shall consider the "need for the sentence imposed to afford adequate deterrence to criminal conduct."

As to *specific* deterrence, as a result of this prosecution Mr. Neisser will no longer work in the municipal engineering/contracting industry. There is no reason to believe he will engage in the sort of misconduct he engaged in here. Nor is there reason to believe he will commit crimes in the future. Mr. Neisser is now 65 years old, a significant fact when considering specific deterrence. Empirical studies and observations of federal courts support the conclusion that with respect to an offender the age of Mr. Neisser, the prospect of recidivism is minimal. See United States v. Hodges, No. 07-706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-Booker, courts have observed that recidivism is markedly lower for older defendants" and collecting cases); United States v. Sanchez, No. 99-228-12, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy Guidelines

---

[4] James Hickey, referenced in the Government's above-quoted writing, was an attorney who conspired to land a $3 million public lighting contract in Allentown and bribed an official in Reading, was indicted on multiple counts in both the Allentown and Reading indictments, did not cooperate, pled guilty only on the eve of his scheduled trial, had all but two Counts dismissed, and was sentenced to 18 months imprisonment. Patrick Regan, also referenced in the above-quoted writing, conspired to land the same $3 million lighting contract, "personally and directly interfered with the award process" (per the Government's Sentencing Memo), personally contributed $3500 to Pawlowski's campaign over several months, did not testify at trial, and was sentenced to two years of probation including a period of house arrest.

sentences on older defendants in light of the Sentencing Commission's conclusion that 'recidivism rates decline relatively constantly as age increases.'") (citing U.S. Sentencing Comm'n., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 (2004, and collecting cases).

As to *general* deterrence, the public, and more significantly those in the municipal contracting industry, will know that numerous individuals were charged in this investigation involving corruption in the cities of Reading and Allentown. A Google search reveals hundreds of print and online articles about these related prosecutions. The public and those involved in municipal contracting will see that activity such as Mr. Neisser's has grave consequences: here, a felony conviction, loss of liberty, loss of professional reputation, loss of employment, a "forced retirement," the loss of up to $200,000 of not-yet-vested T&M stock upon Mr. Neisser being charged and terminated, a criminal fine and any additional court-imposed sentence. Given these significant consequences, even with a substantial downward departure/variance, no member of the public could say that Mr. Neisser "got off easy," and only a fool would not be deterred from similar conduct in the face of similar punishment.

Further, Mr. Neisser is not the only one being sentenced in these related prosecutions. Mayor Pawlowski was sentenced to a lengthy period of incarceration, a sentence which one hopes will deter others from engaging in similar conduct. Although Spencer is not sentenced, presumably he will be incarcerated for a substantial period. Those sentences will speak powerfully to the goal of general deterrence. That other defendants receive a substantial benefit for their cooperation (for instance, Francis Dougherty and Eron Lloyd, who were sentenced to lengthy terms of probation) will not reasonably cause the public to conclude that one can "get away" with acts of public corruption.

**D.     § 3553(a)(2)(C) – Protecting the Public from Further Crimes**

Section 3553(a)(2)(C) provides that the Court shall consider the "need for the sentence imposed to protect the public from further crimes of the defendant." As discussed above, the risk of recidivism is negligible. The public will not need to be protected from Mr. Neisser in the future.

**E.     § 3553(a)(2)(D) – The Need for Educational/Vocational Training**

Section 3553(a)(2)(D) provides that the Court shall consider "the need for the sentence imposed to provide the defendant with needed educational or vocation training, medical care, or other correctional treatment in the most effective manner." Mr. Neisser is not in need of educational or vocational training. He has the education, experience, skills and incentive to continue working in some capacity, so that he can generate some funds for himself and his wife. The Probation Department has identified no "reentry needs." (See PSR, ¶ 56.) Mr. Neisser is not a defendant who, at the conclusion of his sentence, will take up a life of crime because he lacks skills to support himself in a law-abiding manner.

**F.     The Need to Provide Restitution**

Section 3553(a)(7) provides that the Court shall consider "the need to provide restitution to any victims of the offense." Here, no restitution is due (see PSR ¶92), as T&M performed well on the municipal jobs it was awarded. No one has claimed otherwise, and Mr. Neisser is not aware of information to the contrary.

**III.     CONCLUSION**

The defense concurs with the Government's sentencing recommendation. Mr. Neisser's pre-indictment cooperation enabled the Government to prosecute public corruption; Mr. Neisser's post-indictment trial testimony was essential to the jury's conviction of the Mayor of a small city. Undersigned counsel respectfully requests that this Court recognize Mr. Neisser's

valuable cooperation by granting an appropriately substantial downward departure. Counsel also respectfully submits that a weighing of the § 3553(a) sentencing factors – including Mr. Neisser's longstanding reputation in the engineering community for professional integrity, his history of generosity to employees and others, his meaningful involvement in the local community, his giving of time and money to many charitable causes, and the minimal risk of recidivism – all warrant a sentence well below the advisory Guidelines.

Respectfully submitted,

/s/ Judson A. Aaron
Judson A. Aaron
1500 Market Street – Centre Square
Philadelphia, PA 19102
Telephone: (215) 864-9600

*Attorney for Defendant Mark Neisser*

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, I caused a true and correct copy of Mark

Neisser's Sentencing Memorandum to be served to the following via the method indicated:

**VIA ELECTRONIC MAIL**
Richard P. Kasarda
U.S. Probation Officer
Allentown, PA
richard_kasarda@paep.uscourts.gov

**VIA HAND-DELIVERY**
Michelle Morgan, Esquire
Assistant U.S. Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
michelle.morgan2@usdoj.gov

**VIA HAND-DELIVERY**
Anthony Wzorek, Esquire
615 Chestnut Street. Suite 1250
Philadelphia, PA 19106
anthony.wzorek@usdoj.gov

Date: April 5, 2019              s/Judson A. Aaron
                                 Judson A. Aaron