# EXHIBIT E

# Proposed Presentation: Navigating the Troubled Waters of *Pay to Play*

  Businesses that seek to obtain government contracts likely know the phrase "pay to play." But, do they know what it really means; do they know where the line from legal to illegal is crossed; do they know the harsh consequences of crossing that line? As a result of my current situation, I know the consequence of crossing the line that separates lawful political giving from bribery or an unlawful *quid pro quo* arrangement. I believe I am uniquely positioned to speak to others in the public contracting arena about my experience, and to "scare straight" those who don't know where the line exists or who might be tempted to cross that line.

  Needless to say, the law prohibits bribery of a government official by someone who seeks to obtain government contracts. But, the law does not outright prohibit political contributions from individuals or businesses that seek to obtain government contracts (although the rules and restrictions on such contributions vary from state to state, city to city, and municipality to municipality.) The laws that regulate this practice of political contributions by public contractors vary tremendously throughout the region where I have done business (Pennsylvania, New Jersey, Delaware), and can be confusing. There is a real need to educate professionals – such as engineering firms involved in procuring public contracts at the local, county, state and federal level – with a clear understanding of the rules that govern political contributions by those who seek public contracts, and the consequence of violating the rules.

  Many companies utilize compliance training professionals, such as compliance officers or outside counsel, to make presentations to employees who are involved in procuring government contracts and meeting with government and elected officials. My role in such a compliance presentation would not be to teach the laws and regulations of campaign finance in detail, but to tell a true-life story, and to impress upon them the ramifications of violating the laws.

  Because this subject matter is important to all who participate in the public arena, I propose to present not only to public contractors, but also to college and graduate students who aspire to be employed by businesses that are involved in public contracting work. In fact, I think my experience might be particularly compelling and impactful for students who are just entering their professions. As someone who has pled guilty to being involved in a conspiracy to give bribes for

municipal contracts, I hope to "scare straight" those who might be tempted to cross the line and preach caution to those who are not aware of the issues or not certain where the line exists. Through my proposed presentation, I'd like to help those who seek public contracts know when to say yes, when to say no, and when to walk away. I'm sure that this would be difficult and embarrassing for me, but I am more than willing to do it if it could act as deterrence for others.

*[The following is an outline of my proposed presentation. The final product would be vetted by counsel and put in the form of a PowerPoint presentation.]*

## A. Introduction

### 1. My history in public contracting

In September of 1978, I started my career as an environmental engineer. I knew about water and wastewater treatment, streets, roads, and other aspects of the engineering profession. I had an excellent education, but no school program teaches "The Politics of Engineering." I believe that is as true now as it was then.

Within weeks of embarking on my engineering career, I was asked to attend a dinner at a local country club. A free dinner is a good thing but why was I invited, I inquisitively asked my seasoned colleagues? I was there to fill the table and show the company's "support" for a local political candidate, I was told. The firm did an enormous amount of work for the County (or wanted to), so we had to buy a few tables worth of tickets. That was the first of thousands of dinners/events I would go to over the next 40 years, and my introduction to "Pay to Play."

## B. "Pay to Play," generally

*[I need not cover this if it is being covered by others, such as a co-presenting compliance officer or attorney.]*

- Pay-to-Play is the system where firms and individuals that do work for a public body, or who want to be considered for such work, contribute money or other items of value to politicians and/or political parties and to their pet causes. The practice is pervasive. A review of publicly available information regarding political contributions reveals that law firms, accounting firms, product suppliers, architectural firms, construction contractors, engineering companies and others

participate in the process at all levels of government. Criticizing this system, one federal judge recently stated:

> *The scenarios that repeatedly played out in this case, I am moved to say, are a product of the Commonwealth of Pennsylvania's highly deficient campaign finance laws. These are the laws that allow unbridled and unlimited campaign contributions to office-seekers and officeholders from individuals desiring to do business with the Commonwealth in one way of the another .... [W]e seriously question the wisdom of [that] system....*

- What are known as Pay-to-Play laws have been enacted at all levels of government. These laws have given rise to the ubiquitous use of PACs. There is nothing inherently unlawful about PACs or making a political contribution through a PAC. [*Here, if a co-presenter such as a compliance officer or counsel will not be addressing the issue, I will address the use of Political Action Committees (PACs) to "funnel" funds to candidates and their causes. I will also address the use of "shortlisting" as a way of eliminating firms that are not preferred by those who are awarding the contracts.*]

- Each state has its own laws/regulations regarding Pay to Play. The laws, however, vary considerably from one jurisdiction to another. Some apply only to certain types of businesses; some apply to all types of contracts, other apply only to contracts awarded through a competitive bidding process, and most of these laws are limited to contracts over a certain dollar threshold., And, whatever state laws may apply, many municipalities impose their own restrictions. [*Here, I will generally discuss the way in which laws governing political contributions can vary regionally, in Pennsylvania, New Jersey and Delaware. For example, the way in which limits on contributions to individual candidates by individuals and corporations differ from the limits on contributions to Political Action Committees, and how those contributions must be publicly reported. And, for example, the way in which state laws governing political contributions can differ from local ordinances, a prime example being local pay-to-play ordinances that were enacted in the Lehigh Valley where I did business while employed at T&M.*]

3

- It's a sad fact that pay-to-play will continue to exist until we take the money out of politics. Municipal contractors will continue to be asked to make political contributions, and they will continue to make those contributions or risk not even being considered for municipal bids. For those involved, caution, at all times, is needed.

## C. <u>Why am I here?</u>

I'm not here to teach you pay-to-play laws in detail, nor to condemn lawful campaign and political contributions. I'm here to tell you of my experience in the pay-to-play world, the temptations and the consequences of breaking the law. I hope to educate you and scare you silly to stay on the right side of the law so you don't end up like me.

1. <u>Personal and educational background</u>

- Brought up by parents who practiced and taught me strong personal morals and ethics. Worked in the family business since I was very young. Parents taught me that doing the right thing for people is more important than profit.

- Attended University of Delaware for undergraduate and graduate programs. Studied Environmental Engineering. I had no idea of the role of politics in consulting – that was never mentioned during my schooling.

2. <u>Professional career</u>

- 40 plus years in the civil/environmental consulting business. In 1975, started out in geotechnical engineering. Then went to graduate school. In 1978, went to work for a New Jersey based municipal/civil/environmental consulting firm. Became project manager and client manager. Started going to political events. In 1984, one of several who started new firm. Owner of firm passed away and at 35 was made president of 100-person firm. At a young age I was thrown into a lot of business decision making including the making of political contributions. In 2005, became director of marketing for a 300-person firm and Regional Business Development Manager. Was on the board of directors, the managing committee, and the contribution committee.

3. <u>My experience with campaigns, political contributions, pay-to-play</u>

• I had no idea the extent politics and contributions played in engineering profession; I expected work to be won solely on experience, qualifications and price. And in fact, I learned that politics aside, you did have to be capable of performing the work for which your company bid.

• Why participate in the political process? Your company is always competing with other public contracting firms, and those firms will certainly participate in the political process.

• I believed it was not unlawful for my employer to make political donations. In fact, my last employer set up a committee that reviewed and approved (or not) all requests for contributions. Our president as well as our general counsel sat on that committee. I thought I understood the contribution laws. I preached caution to others.

4. <u>The facts of my case</u>

• [*Here, I'll tell the story. A brief summary follows ….*] Unbeknownst to me, the FBI was conducting a public corruption investigation in Reading and Allentown, focusing on municipal contracts and political contributions, and whether firms were contributing money to elected officials in return for being awarded municipal contracts, including contracts related to legal services, public lighting and engineering projects. My employer, an engineering firm, did work in both cities and was bidding on work. I, along with other colleagues, was involved in business development. We retained "consultants" who knew the local business and political landscape, who were involved in raising money and managing mayoral campaigns for the mayors, and who were to keep us informed as to the political situations in the region and opportunities for work. My firm made contributions to the mayors through a Political Action Committee. Although we fired our consultants because they seemed incompetent, we were subsequently contacted by one of the former consultants to support his favored candidate's mayoral campaign. I had conversations, telephonically and in-person, with the former consultant and the mayor during which we discussed engineering work that was to be awarded and political contributions that they sought. The connection was clear, that my company should make the political contributions and we would then be considered for the municipal contracting work for which we were bidding. This

5

is what I knew: that this crossed the line from lawful political giving to unlawful pay-to-play, to a bribery conspiracy, to what is known as quid pro quo. This is what I did not know: that the FBI, through a confidential informant, was tape recording every one of my conversations with the consultant and the mayor. The conversations showed a *quid pro quo*, that is, an agreement that I will cause my firm to give money to your campaign if you help us get our bid municipal work.

• In my many years in the engineering industry I had exercised caution and advised others to do the same when it came to politics and business. But in this situation, in Pennsylvania's Lehigh Valley, I did not follow my own advice.

• I pled guilty to conspiracy to commit bribery and agreed to cooperate with the Department of Justice. Testified in federal court at the trial of former mayor of Reading.

### D. **What should I have done?**

• I should have practiced not only what I had always preached, but what I had always practiced. I should have reminded my self why we fired the former consultants, because they seemed unknowledgeable, incompetent and untrustworthy. I should have hung up the phone when I was subsequently called by the consultant and mayor seeking money. I should have walked away from our meeting because it was clear this was not right. I should have put my lifelong ethical values over winning work. I should have reported to my superiors that I would have nothing further to do with these individuals.

### E. **The effects of my conviction on my life**

• [*I will add the Court-imposed sentence here*]

• Lost my well-paying position and ability to earn in the future. Have not worked in engineering since 2016 and most likely will not again.

• Had to re-evaluate our plans for retirement. Our retirement will look very different.

• No longer a licensed Professional Engineer

• Tremendous strain on my wife, marriage, and family.

6

- Embarrassment and shame. My parents would be devastated!

- Effects on physical and emotional health, including depression and anxiety.

F. **<u>Final advice from someone who should have known better</u>**

    • Be on the alert when you are involved in bidding on municipal or public contracts. Don't subscribe to the pervasive and casual attitude that "everyone does it, so what's the big deal?" If you have any concern that you are being asked to cross the line – such as, if a public official or a campaign representative asks you to give money and/or raise money from others – go to your boss, your corporate compliance officer, your compliance Hotline, your general counsel and have a discussion. Be mindful of buzz words used by political fundraisers, such as "could use your help," "not that one thing has anything to do with the other," "your support would be greatly appreciated." Protect your career, your reputation and your freedom. If your gut tells you something is fishy, walk away.

    Take it from me, no effort to win a project or please your boss is worth the trouble you can get into.